FITZPATRICK, Plaintiff, v. STATE BOARD OF EXAMINERS et al., Defendants; PEARL ASSURANCE COMPANY, LTD., Intervener.

(No. 7,706.)
(Submitted June 15, 1937. Decided July 12, 1937.)
[70 Pac. (2d) 285.]

236

*Mr. Howard Toole, Messrs. Toomey, McFarland & Chapman,* and *Mr. W. T. Boone,* for Plaintiff, submitted an original and a supplemental brief; *Mr. Toole* and *Mr. E. G. Toomey* argued the cause orally.

*Mr. Harrison J. Freebourn,* Attorney General, and *Mr. Enor K. Matson,* Assistant Attorney General, for Defendants; *Mr. Matson* argued the cause orally.

*Mr. S. C. Ford* and *Mr. Sam D. Goza, Jr.,* for Interveners, submitted a brief, and argued the cause orally.

MR. JUSTICE ANDERSON delivered the opinion of the court.

Plaintiff as a resident taxpayer of Missoula county brought this action against certain state officers in their official capacities, seeking an injunction restraining them from doing certain acts in connection with certain insurance contracts entered into by the State Board of Examiners as a result of the passage, approval, and the subsequent defeat by the referendum, of the State Insurance Law. The Pearl Assurance Company, Limited, has, after leave of court obtained, filed a complaint in intervention. It also has filed a demurrer to the complaint and, without waiver of the demurrer, an answer to the original complaint. The defendants have filed a demurrer to the original complaint. The cause was submitted to us for decision on these pleadings after oral argument and briefs filed.

The legislature passed, and the Governor approved, what was known as the State Insurance Law in 1935 (secs. 173.2 to 175.20, inclusive, Rev. Codes). The constitutionality of this law was unsuccessfully assailed in the case of *State ex rel. City of Missoula* v. *Holmes,* 100 Mont. 256, 47 Pac. (2d) 624, 100 A. L. R. 581, in so far as it applied to state, county, and school district property. Thereafter a referendum of this law was had and the law was defeated at the general election held on November 3, 1936. The Governor issued his proclamation declaring the result on December 2, 1936.

The Act (Laws 1935, Chap. 179) by express terms became operative on June 1, 1935, (sec. 22). Section 9 of the Act (Rev. Codes, sec. 173.10) provided: "The State Board of Examiners must reinsure or purchase excess insurance in a reliable insurance company or companies such portion of their insurance liability as is commensurated [commensurate?] with the principles of safe underwriting, and shall prescribe such rules and regulations as may be necessary in placing and handling this

reinsurance and/or excess insurance. The cost of the reinsurance is to be paid out of the state insurance fund."

On that day, presuming to act under this section, the State Board of Examiners, as then constituted, entered into a contract for reinsurance with the intervener. This contract was for the term of three years. It reinsured the state and the State Insurance Fund against all loss from the perils enumerated in the State Insurance Act. A cancellation clause found in this document provided for its cancellation by the reinsured at any time and by the intervener upon sixty days' notice. If it was canceled by either the state or it became void or ceased, the intervener was authorized to retain, of the premiums paid, "the customary short rate." If the intervener canceled the policy, it could retain only the pro rata earned premiums.

Numerous policies were issued on state, county, and school district property under the State Insurance Act. On May 1, 1936, the State Board of Examiners entered into an insurance contract with the intervener, insuring state property only against direct loss or damage by fire and lightning on a standard form fire insurance policy. Indorsements were made on this policy to the effect that if the law was declared valid by this court, or if the law was approved at the election on the referendum, no premiums would be due on the policy, but if the law became inoperative as a result of the decision of this court, or an unfavorable vote at the election, then the company assumed liability for direct loss by fire and lightning. At the time this policy was written there was pending in the courts an action asserting the unconstitutionality of the Act on other grounds than those decided in *State ex rel. City of Missoula* v. *Holmes,* supra.

On March 15, 1937, the majority of the State Board of Examiners entered into a written contract with the intervener, whereby the original reinsurance contract was declared canceled as of December 2, 1936. The unearned premium was determined on a short rate basis, which it was agreed should be retained in part payment of the premium on the policy which was written on state property alone, the state agreeing to pay the

residue of this premium after making this deduction from the stipulated premium in the policy.

The plaintiff contends that the primary policies of insurance, as well as the contract of reinsurance, all written for a term of three years, were canceled by operation of law on the issuance of the proclamation by the Governor declaring the result of the vote on the referendum; that it then became the duty of the state officers to compute all unearned premiums on a pro rata basis and to refund on this basis to all who had insured under the Act; and that the contract of May 1, 1936, was void, since it was written when such a contract was prohibited by law. Furthermore, that its consideration was invalid, as it provided for the cancellation of the reinsurance contract upon a short rate basis instead of pro rata; that a substantial part of the consideration should have been repaid to the counties and school districts which had contributed to the State Insurance Fund; that a part of the consideration which was to be paid in July, 1937, and July, 1938, was to be paid without any specific appropriation in violation of section 10, Article XII of the state Constitution; that the contract of March 15, 1937, is void in that the State Board of Examiners did not have the power to enter into it; that the consideration was bad for the same reasons as asserted in connection with the contract of May 1, 1936, mentioned supra. Likewise the same contention is made as to the withdrawal of funds from the state treasury without a specific appropriation and a loaning of credit of the counties and school districts to the state, in violation of section 1, Article XIII of the Constitution. Plaintiff, however, does not contend that the State Board of Examiners is wholly without authority to enter into contracts of insurance for the protection of state property.

The State Insurance Act was in full force and effect during the interim allowing the people to act between its operative date as declared in the Act itself, and the date of the declaration of the result of the election. (Article V, sec. 1, Const.; *State ex rel. Esgar* v. *District Court,* 56 Mont. 464, 475, 185 Pac. 157.)

An Act of the legislature, when it is referred, voted upon by the people, and by them disapproved, thereby becomes ineffective from the beginning, not because the people repealed it, but because it lacks the approval of a constitutional branch of the legislative department. The entire process of the referendum is legislative in character. (*State ex rel. Esgar* v. *District Court*, supra; *State ex rel. Hay* v. *Alderson*, 49 Mont. 387, 142 Pac. 210, Ann. Cas. 1916B, 39; *In re McDonald*, 49 Mont. 454, 143 Pac. 947, L. R. A. 1915B, 988, Ann. Cas. 1916A, 1166.)

The State Insurance Act was terminated on December 2, 1936, not by repeal, but by reason of its failure to obtain the approval of a constitutional branch of the legislative department; although it was not repealed in many respects, its status thereafter was akin to the status of a law which had been repealed. The fact of the destruction of the Act by the legislative department, which Act had for an interval of time been in full force and effect, leads to the inquiry as to how far the legislative department may travel in intermeddling with the affairs of counties and school districts.

Many counties, including Missoula, and school districts had during the uncertain life of the Act made contributions to the State Insurance Fund in accordance with its terms for insurance on their buildings against the perils enumerated in the Act, and thereby they were entitled to the benefits therein provided. Upon the termination of the Act, all authority for all that had been done under it and all authority to perform the obligations created under the Act ended, unless preserved in whole or in part by some constitutional provision.

A county is a political subdivision of the state for governmental purposes, and as such is at all times subject to legislative regulations and control, except in so far as the Constitution has placed limitations upon the legislative department. (*Independent Pub. Co.* v. *Lewis and Clark County*, 30 Mont. 83, 75 Pac. 860; *Yellowstone County* v. *First Trust & Savings Bank*, 46 Mont. 439, 128 Pac. 596; *Hersey* v. *Neilson*, 47 Mont. 132, 131 Pac. 30, Ann. Cas. 1914C, 963; *Edwards* v. *Lewis and Clark County*, 53 Mont. 359, 165 Pac. 297; *Majors* v. *Lewis and Clark*

*County,* 60 Mont. 608, 201 Pac. 268; *Stange* v. *Esval,* 67 Mont. 301, 215 Pac. 807; *Bignell* v. *Cummins,* 69 Mont. 294, 222 Pac. 797, 36 A. L. R. 634; *State ex rel. City of Missoula* v. *Holmes,* supra.)

A school district is in this respect in the same category as is a county for all purposes now under consideration. (*State ex rel. Redman* v. *Meyers,* 65 Mont. 124, 210 Pac. 1064; *McNair* v. *School Dist. No. 1,* 87 Mont. 423, 288 Pac. 188, 69 A. L. R. 866; *Pierson* v. *Hendricksen,* 98 Mont. 244, 38 Pac. (2d) 991.)

These political subdivisions of the state may not claim the constitutional protection of the due process clause, or the provisions prohibiting the impairment of the obligation of existing contracts by legislative Act found in the federal and state Constitutions. (*Laramie County* v. *Albany County,* 93 U. S. 307, 23 L. Ed. 552; *Commissioners of Tippecanoe County* v. *Lucas,* 93 U. S. 108, 23 L. Ed. 822; *City of Worcester* v. *Street Ry. Co.,* 196 U. S. 539, 25 Sup. Ct. 327, 49 L. Ed. 591; *City of Trenton* v. *New Jersey,* 262 U. S. 182, 43 Sup. Ct. 534, 67 L. Ed. 937, 29 A. L. R. 1471; *Scott County* v. *Johnson,* 209 Iowa, 213, 222 N. W. 378. See, also, *State ex rel. City of Missoula* v. *Holmes,* supra.)

Applying the foregoing principles, we conclude that the so-called policies of insurance issued by the proper officer or officers in favor of the counties and school districts were, after December 2, 1936, at an end; the state was no longer legally obligated, nor was the State Insurance Fund legally obligated, to pay these political subdivisions for any loss sustained by them as a result of the perils enumerated in the Act. The State Insurance Fund, as such, was destroyed. The funds formerly a part of this special fund not expended, thereafter reposed in the state treasury, subject to disposition by the will of the legislative department. Any unearned premiums which the state might be entitled to receive under the contract of reinsurance as a result of its cancellation, if returned to the treasury, would be subject to appropriation by the legislature for any public purposes, limited only by the provisions of the state Constitution.

We next approach the consideration of the contention attacking the validity of the reinsurance contract. If this contract was valid, then the cancellation of the two policies was valid.

As to the cancellation of policies between the state and the ▉ insured political subdivision, the Act provided: "Cancellation for reasonable cause or upon advice of the fire marshal shall be allowed and adjusted pro rata." (Sec. 173.6 Rev. Codes.) Clearly, this provision has no application to reinsurance contracts. As we read the entire Act, the State Board of Examiners was commanded to reinsure. The amount and terms of such contract were left to the discretion of the board. The policy was declared by the Act, but the details of putting it into operation were left to the board. This was not a delegation of legislative power. (*State ex rel. City of Missoula* v. *Holmes*, supra.) It is not here contended that the board could have secured a better contract than it did, or that it acted in bad faith in entering into the contract it did, but only that it was without power to enter into a contract providing for cancellation of the reinsurance contract on any other basis than a pro rata return of the unearned premiums. Whether the contract was the best that might have been secured under the circumstances is a question with which this court is not concerned. If the board acted unwisely, or entered into a contract which resulted in a financial loss to the state which might have been avoided, those who made the contract are answerable to the people.

A "contract of reinsurance" is defined by our statute, section 8149, Revised Codes, as follows: "A contract of reinsurance is one by which an insurer procures a third person to insure him against loss or liability by reason of such original insurance." Under section 9 of the Act (sec. 173.10, Rev. Codes), the board was to contract for such amount of reinsurance as was commensurate with safe underwriting. The board had authority, if it so desired, to enter into a contract for reinsurance with the short rate cancellation clause in the contract. Hence it follows that the board could adjust the cancellation on that basis.

As we have already noted, the board in making the settlement ▉ allowed the intervener to retain the portion of the un-

earned premium on the reinsurance contract and apply it on the new fire insurance policy. It is stated that under section 10 of Article XII of the Constitution, the board is without authority to draw money from the treasury except in pursuance of specific appropriations made by law, and then only to remove money from the treasury upon warrants issued after a claim had been allowed by the State Board of Examiners. The legislature in 1935 appropriated a sum adequate to pay the premiums on these insurance policies for the biennium commencing July 1, 1935 (Laws 1935, p. 521), and the legislature in 1937 appropriated sums for the biennium commencing July 1, 1937, for insurance on state property (Laws 1937, pp. 673, 686.) Any money which might have been repaid by the intervener into the state treasury was, as we have already decided, unappropriated, and there were specific appropriations, as we have demonstrated, authorizing the expenditure of definite sums for fire insurance on state buildings. As we understand the above contention, it is that the money should have been repaid by the intervener to the state treasury, and then paid out only after a claim was filed, allowed, and warrant issued.

Section 20 of Article VII of the Constitution directs the State Board of Examiners to examine all claims against the state, except salaries authorized by law. In the case of *State ex rel. Schneider* v. *Cunningham*, 39 Mont. 165, 101 Pac. 962, 965, in construing this section, the court said with reference to the constitutional provision and the statute in the same form, that ''both apply to unliquidated claims, and not to those the amounts of which have been fixed specifically by contract or by any department of the government having authority to fix them.''

The unearned premium, which was not returned but retained, in fact was not in the state treasury; the Board of Examiners had theretofore agreed to pay a stipulated premium for fire insurance policies. The contract had been executed by an authorized state board (*Miller Insurance Agency* v. *Porter*, 93 Mont. 567, 20 Pac. (2d) 643), and accordingly there was no necessity for the presentation of a claim for the amount due, for that had already been determined. The claim was no longer

244

unliquidated and no warrant was necessary as to the sum retained, for it was not in the state treasury. At most, the method of handling the transaction was a method of bookkeeping, and we are unable to see wherein the fire insurance policy was invalid.

It is asserted that by the state retaining the contributions of ▆▆▆▆▆ the counties and school districts, they are required to donate their credit, in violation of section 1, Article XIII of the state Constitution; but that provision relates to donations made to any individual, association, or corporation. The state is not among those to whom a donation may not be made. As to these contributions there is a moral obligation resting upon the state. In equity and good conscience the state should reimburse all the counties and school districts for the unearned portion of the insurance premiums paid to the State Insurance Fund, since the legislative department has deprived these political subdivisions of the benefits under the Act. The legislative department acting within its powers, and it alone, can restore to these political subdivisions the sums which are justly due them, and relief of that character may only be obtained from that department.

It is ordered that a judgment be entered granting plaintiff relief to the extent that the defendants be enjoined from proceeding in any manner to perform any act with respect to the State Insurance Act, and that the plaintiff be denied any further or other relief.

Associate Justices Stewart and Morris, and Honorable S. E. Paul, District Judge, sitting in place of Mr. Justice Angstman, disqualified, concur.

Mr. Chief Justice Sands:

I cannot agree with my associates in several important conclusions reached in their opinion, but my different views of the law of this case, as a minority of the court, can have no practical effect. Therefore, in view of the ineffectiveness of any differences I might point out, I merely express my dissent.